## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cody Raymond Kern,                    Case No. 0:24-cv-348 (KMM/SGE)

        Plaintiff,

v.                                   **ORDER**

Shireen Gandhi, in her capacity as the
Commissioner of the Minnesota
Department of Human Services, State of
Minnesota,

        Defendants.

Before the Court is Defendants State of Minnesota and Shireen Gandhi's Motion to Dismiss (ECF 50) Plaintiff Cody Raymond Kern's First Amended Complaint ("FAC") (ECF 48). For the reasons that follow, the motion is **GRANTED IN PART** and **DENIED IN PART**.

I.    **Allegations**

The following allegations are found in Mr. Kern's FAC.[1] Mr. Kern resides at the Minnesota Security Hospital ("MSH") in Saint Peter, Minnesota, pursuant to a civil commitment order from a Minnesota court. FAC ¶¶ 1–2. He has been committed to the MSH since August 2019. *Id*. Mr. Kern alleges several medical diagnoses, including schizoaffective disorder, bipolar type, and autism spectrum disorder. *Id*. ¶ 12. Broadly speaking, this case concerns Defendants' accommodation of one of Mr. Kern's diagnoses— autism spectrum disorder—and the effect of that diagnosis on the conditions of Mr. Kern's confinement at MSH.

According to the FAC, MSH uses a progressive "liberty level" system designated by colors. *Id*. ¶ 22. The colors are, in order from less liberty to more liberty, grey, orange, yellow, blue, and green. Id. Residents begin at grey and then work to achieve greater privileges. *Id*. ¶ 23. Mr. Kern alleges that "[o]nce residents achieve green, [] they are eligible for discharge." *Id*. Mr. Kern began at grey in September 2019, before moving through several different housing units and eventually achieving yellow status around May 2021. *Id*. ¶¶ 25–33. During this time, Mr. Kern "had no behavioral issues and followed his

---

[1] The FAC was filed following motion practice before Magistrate Judge Leung. *See* ECF 47 (granting leave to amend). At the time the FAC was filed, this Court had pending before it an earlier motion to dismiss (ECF 7) Mr. Kern's original complaint (ECF 1). This Court had already held its hearing on this earlier motion, during which it had ruled in part from the bench while taking other aspects of the motion under advisement. ECF 17 (memorializing bench rulings); *see also discussion, infra*. Given that Mr. Kern filed the FAC and that the Defendants then filed a second motion to dismiss before the Court's ruling on the first motion, the Court chose to deny the first motion as moot and explained that it would rule on one unified motion containing all challenges. *See* ECF 56.

treatment plan," *id*. ¶ 28, and "attended many community outings with no behavior problems," *id*. ¶ 31. Mr. Kern states that in May 2021 he was "approved to put in for the blue liberty level" and was living in a unit "considered pre-transition." *Id*. ¶ 33. At the same time, however, he "went through significant medication changes implemented by MSH staff" and "remained at the yellow liberty level because he needed to stabilize his medications and complete the MSH relapse prevention program." *Id*. ¶¶ 35–36.

In October 2021, Mr. Kern alleges that he was demoted all the way down to grey liberty level and returned to a more secure housing unit. *Id*. ¶ 37. This setback came after a "disputed behavioral incident." *Id*. Over the next year and a half, Mr. Kern again moved between units several times and eventually re-achieved yellow liberty level. *Id*. ¶¶ 38–46. During this time, Mr. Kern "displayed behaviors symptomatic of his ASD," which resulted in adjustments to his medication rather than accommodation. *Id*. ¶ 47. The continuous changes to his residential unit were "chaotic and confusing" for Mr. Kern who, due to his ASD, "struggles with transitions, maintaining relationships, adapting to new environments, and establishing new relationships with unknown individuals." *Id*. ¶ 48.

Mr. Kern alleges that the manifestations of his ASD symptoms were misunderstood and that he was punished for those symptoms rather than for any misconduct. For example, Mr. Kern alleges that on one occasion, he "attempted to engage in a positive social interaction with an MSH nurse … with whom he had a previous positive relationship" at other units he had lived in, but "MSH staff classified [his] behavior as 'stalking' and took

adverse action against him." *Id*. ¶¶ 51–52. Afterward, he alleges his liberty level was lowered to orange. *Id*. ¶ 52. In another incident, Mr. Kern

> was sitting in the café and gazing at a female staff member across the room. Due to his ASD, Kern has difficulty reading facial expressions and maintaining socially acceptable eye contact. The staff member reported Kern's behavior, which was once again classified as "stalking." MSH again took adverse action against Kern and demoted him from orange liberty level to grey liberty level, the lowest liberty level. MSH again discriminated against Kern and punished him for displaying behaviors that are symptoms of his ASD.

*Id*. 53.

Mr. Kern alleges that after this incident, he was relegated to, and kept at, the lowest liberty level because of his ASD symptoms, "including displaying poor social interactions, displaying poor social boundaries, difficulty understanding body language, difficulty understanding gestures, and difficulty understanding facial expressions." *Id*. ¶ 55. He alleges that MSH staff on multiple occasions have expressed ignorance when informed about his ASD and his need for accommodation. *Id*. ¶¶ 50, 57. In sum, Mr. Kern alleges that "MSH has failed to accommodate [his] disability, discriminated against him for having a disability, and prevented him from full and equal access to the MSH's direct care and treatment services." *Id*. ¶ 68.

Mr. Kern filed his original complaint on February 6, 2024. ECF 1. In addition to the allegations above, Mr. Kern's FAC adds claims of retaliation. Mr. Kern asserts that in June 2024 and again September 2024, he was informed that he was eligible for blue liberty level status and for placement in a less-secure housing unit. *Id*. ¶ 72. Despite this, he has

remained at yellow level and been kept in the same housing unit. *Id*. ¶ 74. MSH staff are alleged to have refused to provide any guidance about why he has not attained blue level or new housing, or about what, if anything, Mr. Kern must do to attain either. *Id*. ¶¶ 75, 76, 79. Mr. Kern's counsel alleges that after he asked Defendants' counsel about the reasons for the delay, Defendants' counsel ultimately responded that "DHS prefers to potentially address these matters in the context of the settlement conference" set for this lawsuit. *Id*. ¶ 78. According to Mr. Kern, "[t]he only plausible explanation for Defendants' behavior is the fact that Plaintiff has brought a civil rights law suit against them." *Id*. ¶ 83.

Mr. Kern's FAC alleges four causes of action: first, violation by the state of Minnesota and Commissioner Gandhi in her official capacity of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; second, violation by Commissioner Gandhi in her official capacity of the Federal Rehabilitation Act ("RA"), 29 U.S.C. § 794; third, retaliation by the state of Minnesota and Commissioner Gandhi in her official capacity in violation of the ADA; and fourth, retaliation by Commissioner Gandhi in her official capacity in violation of the RA. *Id*. ¶¶ 86–109. Mr. Kern seeks a declaratory judgment that the Defendants' actions as alleged violated the ADA and that Commissioner Gandhi's actions as alleged violated the RA; injunctions against the Defendants from continuing violations of the ADA and RA; injunctions requiring the Defendants to take various affirmative steps to comply with the ADA and RA; compensatory damages under the ADA and compensatory damages excluding emotional harm damages under the RA; and fees and any other relief deemed just and reasonable. *Id*. ¶¶ 110–120.

Defendants filed the pending motion to dismiss on February 18, 2025. ECF 50. Defendants seek dismissal pursuant to Rule 12(b)(6) for failure to state a claim and under 12(b)(1) for lack of subject matter jurisdiction due to sovereign immunity. *See generally* ECF 52 (Mem. in Supp. of Mot. to Dismiss). The Court held a hearing on April 29, 2025, and took the matter under advisement.

## II.    Legal Standards

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of detailed factual allegations in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see also Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019).

Motions to dismiss asserting sovereign immunity arise under Federal Rule of Civil Procedure 12(b)(1). *Brown v. United States*, 151 F. 3d 800, 804 (8th Cir. 1998); *see also Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000) ("Sovereign immunity is a jurisdictional question.") (quoting *Rupp v. Omaha Indian Tribe*, 45 F.3d

1241, 1244 (8th Cir. 1995)). "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack'" to jurisdiction. *Daywitt v. Harpstead et al.*, No. 24-CV-214 (JRT/TNL), 2024 WL 5508586, at *2 (D. Minn. Dec. 17, 2024), *report and recommendation adopted as modified,* CV 24-214 (JRT/SGE), 2025 WL 901598 (D. Minn. Mar. 25, 2025) (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)) (internal quotation marks omitted). In a facial attack, as here, "the Court must restrict itself to the face of the pleadings and Plaintiff receives the same protections as he would defending against a motion to dismiss under Rule 12(b)(6)." *Id*.; *see also Dobbs v. Fond du Lac Rsrv. Bus. Comm.*, No. 19-CV-1289 (SRN/LIB), 2019 WL 7882111, at *2 (D. Minn. Nov. 26, 2019), *report and recommendation adopted*, No. 19-CV-1289 (SRN/LIB), 2020 WL 206347 (D. Minn. Jan. 14, 2020) ("In addressing a facial sovereign immunity challenge to subject matter jurisdiction, a court is to accept all factual allegations in the pleadings as true, and it views them in the light most favorable to the nonmoving party, as it would when ruling on a Rule 12(b)(6) motion.").

## III.    Discussion

The Court first addresses Defendant's jurisdictional argument for dismissal under sovereign immunity, and then turns to Defendants' arguments arising under Rule 12(b)(6).

### A.    Sovereign Immunity

Defendants seek to dismiss Mr. Kern's ADA claims on sovereign immunity grounds under the Eleventh Amendment. The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced

or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The ensuing doctrine of "[s]overeign immunity is the privilege of the sovereign not to be sued without its consent." *Virginia Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011); *see id.* ("[W]e have understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant."). Sovereign immunity is limited by three exceptions: (1) congressional abrogation; (2) state waiver; and (3) suits against individual state officers for prospective relief to end an ongoing violation of federal law, pursuant to *Ex parte Young*, 209 U.S. 123 (1908). *Id.* at 253–54. Minnesota has not waived sovereign immunity for suits against it under the ADA, so Mr. Kern must establish abrogation and/or an exception to sovereign immunity under *Ex parte Young*. Because, for the reasons discussed below, the Court finds that Congress properly abrogated sovereign immunity as to Mr. Kern's claims in this lawsuit, it declines to address the application of *Ex parte Young*.[2]

"Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" *Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (quoting

---

[2] Admittedly, the tests for congressional abrogation and *Ex parte Young* are very different, and given that *Ex parte Young* only provides for official capacity suits against individuals for prospective relief, which exception applies can have consequences. However, at the hearing on the pending motion, both parties agreed that if the Court concluded that sovereign immunity was abrogated as to the State of Minnesota, it need not consider the question of whether Mr. Kern could bring an official capacity lawsuit against Commissioner Gandhi.

*Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 72–73 (2000)). There is "no[] dispute" that Congress intended to abrogate sovereign immunity when it passed the ADA. *Id*. at 364; *see* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."). So, this Court "must inquire 'whether that abrogation is consistent with the scope' of Congress's power under Section 5 of the Fourteenth Amendment." *Hall v. Minnesota Bd. of Physical Therapy*, No. 23-CV-0665 (WMW/LIB), 2023 WL 8934307, at *4 (D. Minn. Dec. 27, 2023), *appeal dismissed*, No. 24-1153, 2024 WL 3530148 (8th Cir. Mar. 27, 2024) (quoting *Klingler v. Dir., Dep't of Revenue, State of Mo.*, 455 F.3d 888, 893 (8th Cir. 2006)).

Mr. Kern's claims arise under Title II of the ADA. Title II provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In *United States v. Georgia*, 546 U.S. 151 (2006), addressed abrogation under Title II and set out a multi-part test. Under *Georgia*,

> the analysis consists of three questions. First, does the alleged conduct violate Title II of the ADA? Second, does the alleged conduct violate the Fourteenth Amendment? Third, if the alleged conduct violates Title II but not the Fourteenth Amendment, is Congress's abrogation of immunity for the alleged conduct still valid?

*Hall,* 2023 WL 8934307, at *4 (further explaining that the third test, which derives from *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997), asks "whether the abrogation of

immunity is congruent and proportionate to the specific harm at issue"). Here, as discussed further below, the Court has already found that Mr. Kern has stated a plausible claim for relief under Title II of the ADA. So the inquiry shifts to whether the FAC also alleges a violation of the Fourteenth Amendment. The Court concludes that it does.

As one basis to establish abrogation over his claims, Mr. Kern asserts that he is being punished for exhibiting his ASD symptoms in contravention of the Fourteenth Amendment. ECF 57 (Opp. to Mot. to Dismiss) at 11–12. "[C]ivilly committed individuals may [not] be punished without running afoul of the Fourteenth Amendment," and "[t]his prohibition against punishment encompasses conditions of confinement." *Karsjens v. Lourey*, 988 F.3d 1047, 1052 (8th Cir. 2021) ("*Karsjens I*"). To determine whether a condition of confinement is punitive, courts apply the standard from *Bell v. Wolfish*, 441 U.S. 520 (1979), which inquires whether a restriction "is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id*. (quoting *Bell*, 441 U.S. at 538). "Absent 'an expressed intent to punish, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to such alternative purpose.'" *Karsjens v. Harpstead*, 74 F.4th 561, 569 (8th Cir. 2023) ("*Karsjens II*") (quoting *Karsjens I*, 988 F.3d at 1052) (cleaned up). However, there is always "a *de minimis* level of imposition [in conditions of confinement] with which the Constitution is not concerned." *Bell*, 441 U.S. at 539.

In urging the Court to dismiss Mr. Kern's contention that he is being unconstitutionally punished, Defendants cite the *Bell* standard as discussed in the *Karsjens* cases and say that it weighs in their favor. *See* ECF 52 at 20. However, Defendants point to no cases applying the "legitimate governmental purpose" balancing test on a motion to dismiss and don't clearly argue for how it should be applied to dismiss Mr. Kern's claims. This makes sense because the questions raised by *Bell* are plainly factual in nature. Here, Mr. Kerns explicitly alleges that he has been punished on at least two occasions for behavior deemed "stalking," but which is actually a manifestation of his unaccommodated ASD. He alleges that, as punishment due to Defendants' misapprehension of his symptoms, his liberty levels have been revoked and he has been returned to more secure residential units, depriving him of both immediate and longer-term freedoms. The Court accepts these allegations as true on a Rule 12(b)(6) motion. Defendants may dispute that these as alleged episodes and consequences occurred at all, or dispute that it was ASD symptoms that led to Mr. Kern's liberty levels being revoked, or intend to offer evidence that Mr. Kern's liberty levels were indeed revoked due to his behavior but also due to/in service of a legitimate governmental purpose. But these are all arguments that would require a factual record that the Court lacks at this juncture. *See, e.g.*, *Pittman v. Swanson*, No. 11-CV-3658 (PJS/TNL), 2023 WL 2404044, at *16 (D. Minn. Jan. 27, 2023), *report and recommendation adopted*, No. 11-CV-3658 (PJS/TNL), 2023 WL 2238703 (D. Minn. Feb. 27, 2023) (declining to dismiss a civil detainee's claim that he was subjected to unlawful punishment, because under the *Bell* standard, "[a]t this stage of the proceedings, this Court

cannot determine as a matter of law which side of the line these forms of punishment land").

Defendants also argue that, to whatever extent Mr. Kerns has been punished, his punishment falls within the *de minimis* exception to the *Bell* standard. But the Court disagrees, at least for now. Certainly Mr. Kern's FAC, which the Court relies upon exclusively at this stage, does not suggest that repeatedly being pushed back down into high-security, low-freedom settings because of his ASD has had a minimal impact on Mr. Kern's life. To the contrary, the FAC, while not alleging shocking or overtly abusive conduct, alleges a pattern of punishment that goes to fundamental aspects of Mr. Kern's quality of life. And he alleges that such demotions move him materially farther away from release.

That was not the case in *Wickner v. Collelo*, the only citation provided by the Defendant for the *de minimis* exception. *See* ECF 52 at 20–21. In *Wickner*, the court determined that a detainee's allegation that officials had authored false reports about him and placed him in "administrative restriction status" was *de minimis* punishment because the detainee failed to allege how these actions had actually harmed him and was instead merely speculating about the possibility of future consequences that might befall him. No. CIV. 11-3448 DWF/JJK, 2011 WL 6960975, at *3 (D. Minn. Dec. 14, 2011), *report and recommendation adopted*, No. CIV. 11-3448 DWF/JJK, 2012 WL 32940 (D. Minn. Jan. 6, 2012); *see also Kalombo v. Skillet*, No. 24-CV-1977 (NEB/DJF), 2024 WL 4609054, at *2 (D. Minn. Sept. 16, 2024), *report and recommendation adopted*, No. 24-CV-1977

(NEB/DJF), 2024 WL 4608836 (D. Minn. Oct. 29, 2024) (*de minimis* punishment where detainee's allegations focused on the inadequacy of "breakfast options"). Mr. Kern has not failed, as in *Wickner*, to allege the actual consequences of Defendants' conduct that he alleges is punishment. Again, while Defendants may believe that the evidence will show that revocations of Mr. Kern's liberty levels have had little punitive effect, such belief does not guide the Court's judgment on this motion.

Because the Court finds that the FAC alleges violations of the ADA and alleges violations of Mr. Kern's Fourteenth Amendment right to be free from punishment in his civil detention, the Court finds that Congress validly abrogated sovereign immunity as to his Title II claims under the ADA, and no further analysis under *Georgia*'s third step is necessary.

**B.    Previously Adjudicated 12(b)(6) Arguments Under the ADA or RA**

Defendants argue for dismissal of Mr. Kern's ADA and RA reasonable accommodation claims under Rule 12(b)(6). Defendants assert that in complaining about the lack of accommodation of his ASD, Mr. Kern is merely alleging "improper medical treatment decisions [that] are not cognizable under the ADA or RA" in the Eighth Circuit. ECF 52 at 10; see *id*. at 12 ("Because Plaintiff's allegations amount to no more than an expression of disagreement with the decisions of his treatment providers concerning his alleged disability, Plaintiff fails to state a cognizable ADA or RA claim."). Defendants also argue that Mr. Kern has failed to state a claim under the RA because he has failed to allege

sufficient facts that his disability served as the "sole impetus" for the allegedly discriminatory acts committed against him. *See id*. at 26–27.

Defendants made these same Rule 12(b)(6) arguments in their motion to dismiss Mr. Kern's original complaint. The Court previously denied Defendants motion with respect to these arguments during the hearing on that motion. In particular, the Court noted that although discovery could bear out Defendants' position that Mr. Kern is, in fact, merely complaining about the details of his medical treatment, the pleadings do more than enough to allege a comprehensive failure to accommodate his ASD that goes beyond quibbling over the specifics of his treatment plan. Likewise, the Court found that while Defendants may be able to prove that various decisions taken about Mr. Kern's confinement have been motivated by reasons other than his ASD symptoms, his well-pleaded allegations make the plausible case that these symptoms, and Defendants' hostile reaction to them, are the sole reason that he has failed to attain higher liberty levels. For now that is enough.

For the sake of creating a clear appellate record, Defendants now renew arguments around these previously adjudicated issues in their second motion to dismiss. *See id*. at 1 n.2. The Court appreciates Defendants' efforts to preserve these issue for review, given the overlapping nature of the pleadings, the motions to dismiss, and the Court's partial prior rulings. For the reasons already stated on the record at the hearing on Defendants original motion, the Court again concludes that Mr. Kern has stated a claim under the ADA and RA, and Defendants' motion to dismiss is once again denied with respect to any arguments to the contrary.

14

### C.    Failure to State a Disparate Treatment Claim

Defendants also argue that Mr. Kern has failed to state a claim for disparate treatment under either the ADA or RA. ECF 52 at 12–13. Mr. Kern has clarified that "he is not bringing a claim based on disparate treatment, or even disparate impact," and that his claims are based only on a failure to accommodate. ECF 57 at 2–3. To the extent that Mr. Kern's position was not clear from the pleadings, the Court grants Defendants' motion to dismiss any claim based on disparate treatment.

### D.    Failure to State a Claim for Compensatory Damages

Mr. Kern seeks compensatory damages under the ADA and RA.[3] Defendants seek dismissal of these claims to the extent they request this relief. To prevail on a claim for compensatory damages under these statutes, [Mr. Kern] is required to allege facts establishing intentional discrimination. *Wong v. Minnesota Dep't of Hum. Servs.*, 216 F. Supp. 3d 991, 1000 (D. Minn. 2016); *see also Meagley v. City of Little Rock*, 639 F.3d 384, 388 (8th Cir. 2011) ("[D]iscriminatory intent is required before a plaintiff may recover compensatory damages for an ADA or Rehabilitation Act violation.") (internal quotation marks omitted). To prove intentional discrimination, a plaintiff must show deliberate indifference. *Meagley*, 639 F.3d at 389. "The deliberate indifference standard, unlike some tests for intentional discrimination, does not require a showing of personal ill will or animosity toward the disabled person, but rather can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Id*. The Court finds that, at the

---

[3] Defendants separately seek dismissal of any claim for compensatory damages from emotional harm under the RA. *See* ECF 52 27–28. Emotional distress damages are not available under the RA. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022). However, it is sufficiently clear from the face of the FAC that Mr. Kern is not seeking emotional distress damages under the RA, *see* FAC ¶ 118 (asking the Court to "[a]ward compensatory damages, excluding damages for emotional harm, in an amount in excess of Fifty-Thousand Dollars ($50,000.00) pursuant to the Federal Rehabilitation Act"), and so the Court need not decide this issue. However, the FAC does not similarly disavow emotional harm damages under the ADA, which are available under certain conditions. *See, e.g.*, *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 797 (8th Cir. 2007) (citing *Foster v. Time Warner Entm't Co., L.P.*, 250 F.3d 1189, 1196 (8th Cir. 2001)).

pleading stage, Mr. Kern has adequately alleged deliberate indifference by Defendants to the likelihood that their actions, in response to his exhibiting ASD symptoms, violate his protected rights.

"The ADA and the RA 'prohibit, as a type of disability discrimination, the failure to provide reasonable accommodations to a disabled person.'" *Wong*, 216 F. Supp. at 999 (quoting *AP ex rel. Peterson v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, 538 F. Supp. 2d 1125 (D. Minn. 2008)). Mr. Kern alleges that on several occasions, behaviors attributable to his ASD have been misconstrued by Defendants and resulted in adverse actions being taken against him. Mr. Kern alleges that his ASD has not been accommodated. Instead, Mr. Kern alleges that Defendants have punished him, explicitly, for his ASD symptoms by labeling his behavior as "stalking" and thereafter reducing his liberty levels and confining him in more secure housing units. *See, e.g., id.* ¶¶ 52–53 (alleging the misinterpretation of Mr. Kern's attempt at "positive social interaction" with a nurse as "stalking" behavior, with the consequence of adverse action taken against him). He also alleges that he has been subjected to medication adjustments in lieu of proper accommodation of his ASD. *See id.* ¶ 47 ("Rather than address and accommodate Kern's ASD behaviors, the MSH instead, again, adjusted his medications"). Indeed, Mr. Kern alleges that he and his parents have repeatedly attempted to convey to Defendants information about his ASD diagnosis and contextualize his behavior, but that their efforts have been ignored and rebuffed. *Id.* ¶¶ 49-50, 57, 66.

Taken together, the FAC alleges enough to support the inference that Defendants have known about Mr. Kern's ASD and are intentionally responding to his condition (or showing deliberate indifference to his condition) in a manner that violates his rights under the ADA and RA. Defendants undoubtedly disagree that they have, in fact, failed to accommodate any disability of Mr. Kern's, let alone intentionally or with deliberate indifference. But this is a motion to dismiss, and the Court must accept all well-pleaded facts as true. Any determination on the pleadings alone about whether Mr. Kern can *prove* discriminatory intent is premature, as suggested by both cases cited by Defendants in support of dismissal. *See Meagley,* 639 F.3d (upholding a determination of no discriminatory intent, but doing so based on factual and legal findings reached after a district court's bench trial); *A.K.B. By & Through Silva v. Indep. Sch. Dist. 194*, No. 19-CV-2421 (SRN/KMM), 2020 WL 1470971 (D. Minn. Mar. 26, 2020) (rejecting Rule 12 dismissal of compensatory damages claims under the ADA and RA and noting that "the Complaint sets forth sufficient factual matter 'to raise a reasonable expectation that discovery will reveal evidence' to support liability for the wrongdoing alleged") (quoting *Twombly*, 550 U.S. at 556). Whether Mr. Kern can prove intentionality is a question for a another day.

### E.    Failure to State a Retaliation Claim

Mr. Kern's FAC adds a claim for retaliation pursuant to the ADA and RA, alleging that he is being retaliated against for the filing of this lawsuit. FAC ¶¶ 98–109. To state a claim for retaliation, Mr. Kern must establish that "(1) he engaged in statutorily protected

activity; (2) adverse action was taken against him; and (3) a causal connection exists between the adverse action and protected activity." *Rinehart v. Weitzell*, 964 F.3d 684, 689 (8th Cir. 2020) (identifying the pleading requirements under the ADA); *see also Turner v. Mull*, 784 F.3d 485, 493 (8th Cir. 2015) (same requirements under the RA). Assuming that the filing of this lawsuit constitutes protected activity capable of inviting unlawful retaliation, Defendants argue that Mr. Kern has failed to adequately allege that any adverse retaliatory action has been taken or a causal connection between such action and any protected activity. The Court agrees that Mr. Kern has failed to allege an adverse retaliatory act and grants Defendant's motion on that basis. It declines to reach the question of casual connection.

The Court begins with the observation that all of the FAC's allegations of overt punishment discussed *supra*, typified by accusations of reduced liberty levels and confinement to more secure housing, arise from disputed behavioral incidents that occurred before the filing of Mr. Kern's first complaint in this matter. Mr. Kern does not allege any further reductions in his liberty levels since February 6, 2024.[4] Nor does he allege that other steps toward reasonably accommodating his ASD, for example, new treatment plans or therapeutic approaches, have been halted or reversed since that time. Indeed, according

---

[4] If anything, Mr. Kern's pleadings suggest that his liberty levels have improved, albeit haltingly, leading up to and following the filing of this lawsuit. For example, he alleges that in March 2023 he was placed back at the lowest liberty level of grey. FAC ¶ 58. By October 2023, he alleges he was at the orange level. *Id*. ¶ 65. And though he alleges that "there have been no changes to Kern's treatment plan or his liberty level" since the filing of his complaint, *id*. ¶ 67, new allegations in the FAC indicate he has been granted another incremental improvement to yellow, *id*. ¶ 74.

to Mr. Kern's pleadings, Defendants have never conceded that his ASD necessitates any kind of special accommodation, and this position appears to be unchanged before and after this litigation commenced.

Instead, since February 2024, Mr. Kern alleges that he has been repeatedly told he is qualified or "ready" to re-attain a higher liberty level and placement in a less secure housing unit, but that no such changes have occurred and that no one has been able or willing to explain why. *See, e.g.*, FAC ¶¶ 73–74, 77. While the Court does not find that outright punishment of Mr. Kern is required to establish an adverse retaliatory action,[5] the allegation that Mr. Kern has been told he is "ready" for an improved liberty level but being unfairly deprived of one is simply too vague and ambiguous to support a retaliation claim. At worst, Mr. Kern alleges a frustrating pattern of delay by which various individuals involved in his detention have over-promised and under-delivered on improvements to his liberty levels. But asking the Court to find an adverse action in this conduct fails for several reasons.

First, it requires the Court to make too many factual assumptions that he is actually experiencing a delay to an otherwise highly opaque and multifaceted process. Even assuming that Mr. Kern has received promises from his psychologist or other "staff" that

---

[5] Courts in this district have construed adverse action in broader terms that that. *See Larson v. Dep't of Hums. Servs.*, No. 23-CV-1823 (JRT/DJF), 2024 WL 4485572, at *16 (D. Minn. May 16, 2024), *report and recommendation adopted sub nom. Larson v. Minnesota Dep't of Hum. Servs.*, No. CV 23-1823 (JRT/DJF), 2024 WL 4345533 (D. Minn. Sept. 30, 2024) (noting that "[a]n action is adverse for purposes of the ADA if it is enough 'to dissuade a reasonable person from engaging in the protected activity'") (quoting *A.C. ex rel. J.C. v. Shelby County Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)).

he is "ready" for a higher freedom level, the FAC does not allege facts from which the Court can reasonably infer that those individuals are the usual decision-makers about liberty levels or that such promises would normally result in the speedy grant of that higher freedom level. Second, even assuming that Mr. Kern's progress through the liberty levels has been recently delayed in an unusual way, Mr. Kern asks the Court to draw too many negative inferences about the reasons this has occurred. For example, Mr. Kern does not allege facts from which to infer that he is being deliberately misled or lied to by anyone about his readiness to move up, or that anyone has improperly overruled his psychologist, or that circuitous decision-making, is so out of the ordinary that it points to an adverse response to his lawsuit[6] rather than the product of bureaucratic languidity. Indeed, he also alleges that the same "one step forward, two steps back" nature of his progress is due to mishandling of his ASD, rather than his lawsuit.

In short, the FAC leaves too much to speculation about whether Mr. Kern is experiencing new delays to improved liberty levels and whether any delay he is

---

[6] Mr. Kern alleges that Defendants have explicitly acknowledged his lawsuit, by rebuffing his queries about his liberty level and stating that they "prefer[] to potentially address [Mr. Kern's status] in the context of the settlement conference." FAC ¶ 78. Mr. Kern asks the Court to interpret this statement as confirming that he is being punished through delays over his liberty level for filing his lawsuit. But according to Mr. Kern, it was his own counsel that initially inquired of defense counsel about whether he could shed light on when Mr. Kern would be moved to a new housing unit. The fact that Defendants intimated that they would prefer to address a question made to their lawyer through a litigation channel is generally reasonable, more so given the imminent settlement conference that was scheduled between the parties at the time of Defendants' response. The Court declines to infer any suggestion of adverse action in this statement, which furthermore does not indicate that anyone was considering Mr. Kern's lawsuit when making, or even delaying, earlier decisions about his liberty levels.

experiencing is routine or otherwise explainable by non-retaliatory reasons. However subjectively frustrated Mr. Kern may feel about the pace of his liberty improvements and the open-ended promises he alleges he has received, he cites no authority for the notion that the mere maintenance of a status-quo in the conditions of his confinement can constitute adverse retaliatory conduct against him. Accordingly, the Court finds no adverse retaliatory action is alleged in the FAC, and Mr. Kern's retaliation claims are dismissed.

### F.    Failure to State a Claim Against Commissioner Gandhi

Finally, Defendants ask the Court to dismiss all claims against Commissioner Gandhi because Mr. Kern has "failed to allege sufficient facts to establish that she is a proper party." ECF 52 at 33. The Court construes this as a Rule 12(b)(6) challenge to whether Mr. Kern has stated a viable claim against Commissioner Gandhi. Defendants cite only one case in support of their position, *Richards v. Dayton,* No. CIV. 13-3029 JRT/JSM, 2015 WL 1522199 (D. Minn. Jan. 30, 2015), *report and recommendation adopted sub nom. Richards v. Ritchie*, No. CIV. 13-3029 JRT/JSM, 2015 WL 1522237 (D. Minn. Mar. 30, 2015) (adopting R&R). In *Richards*, the plaintiff was an "inmate at the Minnesota Correctional Facility in Stillwater, Minnesota" who brought claims under 42 U.S.C. § 1983, the ADA, and RA against various state officers in their individual and official capacities. 2015 WL 1522199 at *1. The court ultimately recommended dismissal of official-capacity ADA claims against then Minnesota Governor Mark Dayton because the plaintiff had

> not alleged any facts to show that Dayton played any role in the failure to provide him a gluten-free and diabetic diet, gluten-free toothpaste, gluten-free dental floss, and gluten-free dental materials for use in the prison clinic, or an upper gastrointestinal endoscopy with biopsy or genetic testing to confirm the existence of celiac disease and to determine whether his intestinal tract was healing. Thus, there is nothing Dayton can be enjoined from doing that could provide Richards the relief he seeks.

2015 WL 1522237 at *37.

The ADA claims against Governor Dayton in *Richards*, and the court's reasons for recommending their dismissal, have little similarity to those made by Mr. Kern against Commissioner Gandhi. Unlike Governor Dayton's nonexistent role in the specific complained-of conditions of the *Richards* plaintiff's criminal incarceration, Commissioner Gandhi is alleged to be the head of the state agency that is directly responsible for Mr. Kern's civil detention and the conditions thereof. Mr. Kern also alleges various statutory regimes that authorize and empower her, as commissioner, to make determinations about his status, including whether he is ultimately able to return to the community. Notably, the *Richards* court did not recommend dismissal of ADA claims about conditions of incarceration against the then-commissioner of the Minnesota Department of Corrections. *Richards*, 2015 WL 1522237 at \*37 (noting that the plaintiff had alleged that the corrections commissioner "has authority over the DOC, which is responsible for the provision of accommodations (including gluten-free dental materials) required by the ADA"). And the Court does not agree that there is nothing of relevance to Mr. Kern that this Court could enjoin Ms. Gandhi from doing should Mr. Kern prevail in this lawsuit.

As such, the Court will deny the request to remove Commissioner Gandhi from this lawsuit based on the argument that Mr. Kern has failed to allege any basis for her involvement.

## IV.   ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED that:**

1. Defendant's Motion to Dismiss the First Amended Complaint (ECF 50) is **GRANTED in part and DENIED in part**; and

2. The Motion is **GRANTED** to the extent that, consistent with the foregoing discussion, Mr. Kern's retaliation and disparate treatment claims are **DISMISSED without prejudice**.

3. The Motion is otherwise **DENIED**.


Date: June 6, 2025                        *s/ Katherine M. Menendez*
                                          Katherine M. Menendez
                                          United States District Judge