## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cody Raymond Kern,                                      Case No. 0:24-cv-00348 (KMM/SGE)

                    Plaintiff,

v.                                                                    **ORDER**

Shireen Gandhi, *in her capacity as the*
*Commissioner of the Minnesota*
*Department of Human Services*, and the
State of Minnesota,

                    Defendants.

This matter is before the Court on Defendants Shireen Gandhi and the State of Minnesota's Objections to U.S. Magistrate Judge Shannon G. Elkins's Order denying their Motion to Compel (Dkt. 84). For the following reasons, their Objections are overruled, the Order is affirmed in large part, and the Motion to Compel is denied.

## I.    BACKGROUND

On February 6, 2024, Plaintiff Cody Raymond Kern, a resident at the Minnesota Security Hospital[1] ("MSH") in Saint Peter, Minnesota, filed this lawsuit against Defendants alleging violations of the Americans with Disabilities Act, the Rehabilitation Act, and the

_____

[1] The Minnesota Security Hospital now goes by the name the Forensic Mental Health Program. *See* Forensic Mental Health Program, MN Direct Care & Treatment, https://mn.gov/dct/adult-services/inpatient-care/forensic-mental-health-program (last visited Oct. 23, 2025). This Order, however, will refer to it as the Minnesota Security Hospital, as that is the term used by Plaintiff's Complaint.

Minnesota Human Rights Act. (Dkt. 1.[2]) Plaintiff alleges that MSH staff failed to accommodate his autism spectrum disorder ("ASD") diagnosis and have punished him for behaviors stemming from his ASD. (Dkt. 48 ¶¶ 1, 4.)

In 2019, Plaintiff was civilly committed. *See generally In re Kern*, 10-PR-19-52, Index 16 (Minn. Dist. Ct. June 4, 2019).[3] In addition to ASD, Plaintiff has been also diagnosed with schizoaffective disorder, "bipolar type," major depressive disorder, and generalized anxiety disorder. (Dkt. 48 ¶¶ 2–21.) These impairments contribute to Plaintiff operating with what has been referred to as a "diminished" mental capacity. (Dkt. 75-1 at 268 (59:25–60:22).)[4] Nevertheless, Plaintiff is a legal adult who is not subject to a guardianship or conservatorship, and he has the legal authority to make decisions for himself. (*See, e.g.*, Dkt. 75-1 at 377 (49:1–11, 50:12–19).)

Given Plaintiff's situation, his parents, Cynthia and Rodman Kern ("the Kerns"[5]), have been active in Plaintiff's treatment prior to and throughout his residency at MSH.

---

[2] On February 2, 2025, Plaintiff filed an amended complaint (Dkt. 48), which is the operative complaint. Any references to the Complaint in this Order are to the amended complaint.

[3] The state civil docket for that case has been embraced by the pleadings because it is cited in the Complaint and is also a matter of public record. *See Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011).

[4] Citations to deposition transcripts are to the ECF pagination followed by the page and lines of the transcript in page:line format.

[5] Because it is not necessary to distinguish between Cynthia and Rodman Kern for analyzing the relevant issues, the Court refers to the Kerns collectively for all statements or actions made by either person unless stated otherwise.

They have also been supporting their son in this litigation. To assist Plaintiff, the Kerns have frequently communicated directly with Plaintiff's counsel, primarily Jason Schellack.[6] Those communications have given rise to the Motion to Compel currently before the Court. In their Motion to Compel, Defendants seek the production of emails between the Kerns and Mr. Schellack related to this litigation. (Dkt. 65 ¶ 1; *see* Dkt. 68-1 at 369–400.) Defendants also seek to reopen the depositions of the Kerns and amend the Scheduling Order accordingly. (Dkt. 65 ¶ 2.)

In July 2025, Judge Elkins denied the Motion to Compel, concluding that the emails were protected by both the work-product doctrine and attorney-client privilege. (Dkt. 82.) Defendants filed timely Objections to that Order on August 14, 2025 (Dkt. 84), and Plaintiff responded on August 29, 2025 (Dkt. 88).

## II.    STANDARD OF REVIEW

Magistrate judges can hear nondispositive motions in the first instance, subject to reversal by the district court only where the decision is "clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a); *see also* D. Minn. LR 72.2(a)(3). This standard of review is "extremely deferential" to the magistrate judge's decision. *Scott v. United States*, 552 F.

---

[6] As relevant here, Plaintiff's counsel includes Jason Schellack and Molly Whitley from the Autism Advocacy & Law Center, and Chris Morris, who represented Plaintiff in his civil-commitment proceedings. Because Defendants make no argument distinguishing between these three attorneys in making their Motion, the Court will only use Mr. Schellack's name for simplicity, even when referring to actions taken by the other attorneys, individually or collectively. Mr. Schellack is Plaintiff's lead attorney in this matter and was the Kerns' primary contact in the emails at issue.

Supp. 2d 917, 919 (D. Minn. 2008). Clear error exists when, on review of the entire record, "the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed," even if there is evidence to support the magistrate judge's conclusions. *Shukh v. Seagate Tech., LLC*, 295 F.R.D. 228, 235 (D. Minn. 2013). A magistrate judge's decision is contrary to law when it fails to apply or misapplies the relevant law. *Knutson v. Blue Cross & Blue Shield of Minn.*, 254 F.R.D. 553, 556 (D. Minn. 2008).

### III.    DISCUSSION

In objecting to Judge Elkins's Order, Defendants argue that the emails at issue are neither work product nor attorney-client communications. The Court affirms Judge Elkins's Order denying the Motion to Compel because, at a minimum, the emails are protected work product.[7]

### A.    Work Product Legal Standard

The Federal Rules of Civil Procedure state in relevant part:

(A) *Documents and Tangible Things*. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But . . . those materials may be discovered if:

(i) they are otherwise discoverable . . . ; and

(ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

---

[7] The Court declines to address Defendants' objections to Judge Elkins decision regarding application of attorney-client privilege because the Court's conclusion that the emails at issue are all covered by the work product doctrine protects them from disclosure.

Fed. R. Civ. P. 26(b)(3). In protecting these materials, the work-product doctrine "assure[s] that an attorney is not inhibited in his representation of his client by the fear that his files will be open to scrutiny upon demand of an opposing party." *In re Murphy*, 560 F.2d 326, 334 (8th Cir. 1977); *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997) ("The work product privilege is designed to promote the operation of the adversary system by ensuring that a party cannot obtain materials that his opponent has prepared in anticipation of litigation."). The work-product privilege "is an intensely practical one, grounded in the realities of litigation." *United States v. Nobles*, 422 U.S. 225, 238 (1975). The protection extends to information gathered by an attorney that enables them to render complete advice and representation. *Id.* (noting that "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial"); *In re Green Grand Jury Proc.*, 492 F.3d 976, 980 (8th Cir. 2007) (stating that the work-product doctrine serves to facilitate clients "obtaining complete legal advice") (quoting *In re Special September 1978 Grand Jury (II)*, 640 F.2d 49, 62 (7th Cir. 1980)); *Murphy*, 560 F.2d at 334 ("Counsel should be allowed to amass data and commit his opinions and thought processes to writing free of the concern that . . . an opposing party may be entitled to secure any relevant work product documents merely on request and use them against his client."). Protected work product includes "interviews, statements, memoranda, correspondence, briefs, mental impressions, [and] personal beliefs." *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).

**B.    Defendants' Objections**

Defendants appear not to dispute that the emails sent from Mr. Schellack to the Kerns are protected by work product privilege. However, they argue that the emails from the Kerns to counsel are not so protected, and further argue that any protection that covers all such communications between the Kerns and Mr. Schellack has been waived. First, Defendants argue that Judge Elkins erred by applying the Minnesota Rules of Professional Conduct ("MRPC") instead of federal law in analyzing whether the work-product doctrine applies to these emails. (Dkt. 84 at 10–11.) Second, Defendants challenge Judge Elkins's determination that the emails sent by the Kerns are work product because the Kerns are third parties to the litigation. (Dkt. 84 at 11–12.) Third, Defendants assert that Plaintiff and his counsel waived any work-product protection by communicating with the Kerns as third parties because it substantially increased the likelihood that Defendants would obtain the information. (Dkt. 84 at 12-14.) Each Objection is addressed in turn.

**1.    Choice of Law**

The Court disagrees that the R&R improperly relied on the MRPC in determining the question of work product protection. (*See* Dkt. 84 at 10–11.) In fact, Judge Elkins's Order left no doubt that federal law governs this issue. Although she discusses Minnesota's ethical rules in her discussion of attorney-client privilege, Judge Elkins relies on federal law, including Rule 26(b)(3), in her discussion of the work product doctrine and its applicability. (Dkt. 82 at 5–6, 12–15.) Because Judge Elkins correctly cites and applies the governing law—federal law—the Court discerns no error.

6

### 2.    Whether the Kerns are Third Parties or Agents of Plaintiff

Next, Defendants maintain that the emails sent by the Kerns to Mr. Schellack are not protected work product because the Kerns are third parties to this action. (Dkt. 84 at 11–12.) Specifically, Defendants argue that the Kerns' emails are unprotected because the Kerns "are neither parties to this action nor do they serve as Plaintiff's counsel or agents of counsel."[8] (Dkt. 84 at 11.)

As an initial matter, Defendants misread Rule 26 in claiming that the Kerns must be either "Plaintiff's counsel or agents of counsel" to be afforded work-product protection. Rule 26(b)(3) extends protection to work product prepared "by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." This language makes clear that work product encompasses not only attorney work, but also documents created by any representative for the party. Accordingly, the key question is whether the Kerns were acting as Plaintiff's representatives—more specifically, his agents—when communicating with Mr. Schellack. Under federal agency law, the Court concludes they were.

In resolving questions of agency in federal law, courts apply the federal common law. *See, e.g.*, *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740–41 (1989); *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 445 (2003); *Kelley v. S.*

---

[8] The Court notes that Defendants do not dispute that the emails at issue are "documents and tangible things that are prepared in anticipation of litigation or for trial" within Rule 26.

*Pac. Co.*, 419 U.S. 318, 323–24 (1974). In addition to caselaw, federal courts have consistently relied on the Restatement of Agency Law to discern the federal common law of agency. *See Reid*, 490 U.S. at 740; *Wells*, 538 U.S. at 448; *Kelley*, 419 U.S. at 324; *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324 (1992); *Trs. of the Graphic Commc'ns Int'l Union Upper Midwest Loc. 1M Health & Welfare Plan v. Bjorkedal*, 516 F.3d 719, 727–28 (8th Cir. 2008); *Millard Processing Servs., Inc. v. NLRB*, 2 F.3d 258, 262 (8th Cir. 1993).

Typically, an agency relationship is created through expressions made by a principal to an actor, giving that actor actual authority to act on the principal's behalf as an agent. *See Bjorkedal*, 516 F.3d at 727 (citing Restatement (Third) of Agency § 3.01 (2006)). An agency relationship can also be created by a principal's interactions with a third party, even without an express or implied agreement between the principal and agent. This authority— apparent authority—"results from a manifestation by a principal to a third party that reasonably leads a third party to believe that another person is acting as the principal's agent." *Millard Processing*, 2 F.3d at 262; *see* Restatement (Third) of Agency § 3.03. For an agent to be vested with apparent authority, the third party must "reasonably believe[] [that] the actor has authority to act on behalf of the principal and [that] that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03. It also requires that the principal either manifest assent to the agent's acts made to the third party or intend to cause such a belief in the third party. *See id.* §§ 1.03, 3.03; *cf. Millard*

*Processing*, 2 F.3d at 262.[9] A principal's manifestations can include communications and actions, as well as inaction or acquiescence to the agent's words or actions. Restatement (Third) of Agency § 3.03 cmt. b. And, "[i]f the third party has observed prior interactions between the agent and the principal, the third party may reasonably believe that a subsequent act or representation by the agent is authorized because it conforms to the prior pattern observed by the third party." *Id.* "The principal's acquiescence may also be effective to ratify the agent's acts or representations." *Id.*

Although the Court is unaware of anything indicating that Plaintiff expressly gave the Kerns actual authority to act on his behalf, the record readily establishes that the Kerns were acting with apparent authority in their communications with Mr. Schellack. First, Mr. Schellack reasonably believed that the Kerns had authority to act on behalf of their son, Plaintiff. At the outset, Mr. Schellack understood Plaintiff to be a civilly committed individual who was operating with a "diminished capacity" due to ASD and other mental conditions. (*See* Dkt. 87 at 21:14–16, 26:24–27:1.) Those facts contributed to Mr. Schellack's belief that he would be prevented from forming a typical and constructive attorney-client relationship with Plaintiff. At the hearing on the Motion to Compel before Judge Elkins, Mr. Schellack explained:

---

[9] Eighth Circuit caselaw prior to 2006 cites the Restatement (Second) of Agency's requirement that the principal must either "intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief" to create apparent authority. *See* Restatement (Second) of Agency § 27 cmt. a. The Restatement (Third) of Agency altered this condition and now only requires that the principal at least manifest assent to the agent's acts. *See* Restatement (Third) of Agency § 3.03 cmt. b; *see id.* § 1.03 cmt. b.

> I have a client who wants to pursue litigation, but my client has diminished capacity. He is not able to assist me in the way that a neurotypical client, someone without diminished capacity, would be able to help me. My client is not able to independently recall staff members at the St. Peter facility who I need to depose. He's not able to independently help me decide litigation strategy, questions for those people whose depositions we took. . . . He's not able to independently understand and discuss complex legal topics, Your Honor.

(Dkt. 87 at 21:14–22, 22:22–24; *see also id.* at 22:16–20 (noting Plaintiff's inability "to independently direct litigation" and "to understand and discuss complex legal topics," and the fact that "[h]is medications affect his overall cognitive functioning").[10] The Kerns provided consistent testimony. (Dkt. 75-1 at 302 193:18–194:23 (discussing, among other things, Plaintiff's inability to draft or answer interrogatories and develop a litigation strategy).

Plaintiff's civil commitment also posed logistical challenges to Mr. Schellack's representation. For example, Plaintiff did not possess documents Mr. Schellack needed, and those Plaintiff did have, such as his MSH treatments plans, were difficult to obtain due to Plaintiff's lack of email access. To obtain and discuss these documents with Plaintiff, it meant Mr. Schellack had to either drive "an hour and 50 minutes" to meet with Plaintiff in person or to attempt to assist Plaintiff with the tasks of litigation over the phone. (Dkt. 87 at 27:3–9.)

---

[10] Citations to the Motion to Compel hearing transcript are to the ECF pagination followed by the lines of the transcript together in page:line format.

Mr. Schellack reasonably concluded that the Kerns acted on behalf of Plaintiff to bridge this divide. Mr. Schellack stated:

> I have a job to do. I have to represent my client to the best of my ability. If [Plaintiff] can't get me the information, names, data, timelines, if he's not able to sit down with me and help me develop theories of the case and help me understand what went wrong and what kind of remedies would be best suited to his case, I have to figure that out from somebody, and in this case it's been his parents, who have been extremely helpful in helping me understand the history of the case and then go[] forward.

(Dkt. 87 at 26:13–21.) Counsel's belief that the Kerns acted as their son's agents was strengthened by the fact that the Kerns facilitated Plaintiff's retention of Mr. Schellack as his counsel (Dkt. 75-1 at 260 (28:4–23)), signed the fee agreement on Plaintiff's behalf (*id.* at 222 (199:13–19)), and helped draft interrogatory responses for him (*id.* at 191 (75:8–76:24)). Mr. Schellack also provided the Kerns documents to discuss with Plaintiff during the Kerns' weekly in-person visit with their son. (*See* Dkt. 87 at 33:14–17.) Naturally, that correspondence also included the email correspondence that Defendants seek to obtain through this Motion.

Mr. Schellack's conclusion that the Kerns were agents of Plaintiff also tracked with his work experience representing clients with autism. (*Id.* at 34:20–24 ("[Judge Elkins]: In your practice at the Autism Advocacy & Law Center, do you routinely work with parents of individuals who have mental deficiencies and defects? [Mr. Schellack]: That is absolutely correct[.]").) Simply put, the Kerns were consistently performing client-like duties, leaving Mr. Schellack with the reasonable belief that the Kerns were acting as

Plaintiff's agent during their interactions. (Dkt. 87 at 31:11–13 (Mr. Schellack stating, "I think it's pretty clear that Mr. and Mrs. Kern, [Plaintiff's] parents, are acting as his agent with regard to helping him with the litigation.").)

Mr. Schellack's conclusion is also supported by Plaintiff's own statements and conduct. For one, Plaintiff testified to telling his parents that he wanted an attorney, who in turn retained Mr. Schellack. (Dkt. 75-1 at 372 (31:17–23).) Even after Mr. Schellack's retention, Plaintiff "generally look[ed] to his parents for guidance" in navigating that relationship and his case. (Dkt. 87 at 23:2–5; Dkt. 75-1 at 223 (204:18–22) (Rodman Kern testifying that Plaintiff looked to his parents during meetings with Mr. Schellack).) The record is also clear that Plaintiff knew of his parents' actions on his behalf. Plaintiff understood that the Kerns helped gather documents and assisted in drafting his discovery responses, which was noted in one set of responses. (Dkt. 75-1 at 383-84 (76:21–77:4, 78:12–25).) Plaintiff ratified these acts by signing off on the discovery responses that were prepared for him. (*Id.* at 383, 408 (76:7–20, 176:13–25).) *See* Restatement (Third) of Agency § 3.03 cmt. b. Plaintiff's testimony demonstrates his significant reliance on the Kerns throughout this litigation and shows he was well aware of his parents' actions. (*See* Dkt. 75-1 at 408 (174:19–21), (175:6–8) ("[Mr. Schellack] Q Would you have been able to bring this case and litigate without their assistance? [Plaintiff] A No. . . . Q Okay. Do your parents ever help you with making decisions? A Yeah, I talk to them for counsel and whatnot.").) Plaintiff understood that the Kerns were not parties to the action and that "[t]he only reason they're involved is just because they're helping me with the lawsuit[.]" (*Id.* at

374 (39:25–40:1).) These manifestations show that Plaintiff assented to the Kerns' actions on his behalf.

In sum, Mr. Schellack's belief that the Kerns were acting on behalf of Plaintiff is reasonable based on Plaintiff's manifestations that they were his agents, which created apparent authority. *See Stocker v. Castle Inspections, Inc.*, 651 N.E.2d 1052, 1054 (Ohio Ct. App. 1995) (finding that father had apparent authority to act on behalf of son where son arranged for father to be present at home inspection in his stead); *Lollis v. Dutton*, 807 S.E.2d 723, 731 (S.C. Ct. App. 2017) (finding that son had apparent authority to act on behalf of his mother where her "knowledge that [son] was buying and selling property in her name and her tacit acceptance of this practice . . . led [third parties] to believe [son] had the authority to act on Mother's behalf" and they "dealt with [son] based on that assumption") (cleaned up); *Broughsville v. OHECC, LLC*, No. 05-CA-8672, 2005 WL 3483777, at *2 (Ohio Ct. App. Dec. 21, 2005) (concluding the case was "a classic example of apparent authority" where mother-nursing home resident made no attempt to stop or object to her daughter signing a document on her behalf and therefore "knowingly permitted" the acts); *cf. Carr v. Runyan*, 89 F.3d 327, 332 (7th Cir. 1996) (concluding that daughter had apparent authority where mother arranged to have daughter attend negotiations with mother's lawyer in her absence); *Lerner v. Teletron, Inc.*, 156 F.3d 1230 (Table), at *2–3 (6th Cir. 1998) (holding that single defendant attending settlement negotiations on behalf of other defendants had apparent authority to bind them to the settlement agreement). Accordingly, the Kerns were acting as Plaintiff's agents when

communicating with Mr. Schellack, making their emails protected work product under Rule 26.

This conclusion finds additional support in the rationale behind the work-product doctrine. Ultimately, the doctrine protects a lawyer's ability to represent clients without fear of having their thoughts and materials disclosed. *Murphy*, 560 F.2d at 334; *Pittman*, 129 F.3d at 988. In representing Plaintiff, Mr. Schellack has faced significant obstacles given the challenges of representing someone with Plaintiff's conditions who is also civilly committed. Working with the Kerns presented a reasonable workaround for some of those barriers. Documents created through an arrangement where the Kerns acted with apparent authority in assisting Mr. Schellack with representing their son fall within the scope of the work-product doctrine and what it was designed to protect.

Finally, the Court agrees with Judge Elkins's observation, not directly contested by Defendants in their Objections, that they have not shown the substantial need and undue hardship required by Rule 26(b)(3)(A)(ii) to discover the emails despite their protected status.

### 3.    Waiver

Lastly, Defendants object to Judge Elkins's conclusion that the work-product protection was not waived. (Dkt. 84 at 12–14.) Defendants maintain that Mr. Schellack waived protection by emailing the Kerns, who are, in Defendants' eyes, third parties to the

litigation, and also argue that those communications "substantially increased the risk of disclosing that information to Defendants[.]"[11] (*Id.* at 13)

Work-product protection "is not absolute and may be waived." *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 732 (8th Cir. 2002). A party can waive this protection by disclosing materials to a third party in two different ways. The first is disclosure made with the "actual intention that an opposing party may see the documents." *Pittman*, 129 F.3d at 988 (emphasis omitted) (quoting Wright & Miller, 8 Fed. Prac. & Proc. Civ. § 2024 at 209 (3d ed.)). The second is disclosure that "has substantially increase[s] the opportunities for potential adversaries to obtain the information." Wright & Miller § 2024; *see also United States v. Johnson*, 378 F. Supp. 2d 1041, 1047 (N.D. Iowa 2005) (collecting cases where courts determined that waiver occurred because disclosure to a third party "substantially increase[d] the likelihood that an adversary would come into possession of the material" (emphasis omitted)). Determining whether waiver occurred entails a "case-by-case" analysis. *Pittman*, 129 F.3d at 988.

The first flaw with Defendants' waiver argument is that the Kerns are not third parties but were Plaintiff's agents in their communications with Mr. Schellack. But even assuming that the Kerns were not Plaintiff's agents, Defendants' argument would fail. Courts have held that an attorney who shares work product with a third party that shares a

---

[11] Defendants do not specifically challenge or otherwise address the two emails from the Kerns that include people other than counsel: one that included John Klocke (Dkt. 68-1 at 380 (Bates No. 00335)), and one that included Dr. Tricia Sudenga (*id.* at 387 (Bates Nos. 00883–00893)). The Court accordingly will not separately analyze these emails.

common interest with the attorney or the attorney's client does not waive protection. *See, e.g., Monarch Fire Prot. Dist. of St. Louis Cnty. v. Freedom Consulting & Auditing Servs., Inc.*, No. 4:08-CV-1424 ERW, 2009 WL 2155158, at *2–3 (E.D. Mo. July 16, 2009) (concluding that attorney did not waive work-product protection over materials disclosed to the former lawyer of an organization that shared a "common interest" with the attorney's client). There is no assertion here that the Kerns do not share such an interest with Mr. Schellack or their son. Thus, the common interest between Mr. Schellack and all of the Kerns precludes waiver.

Defendants also argue that waiver of work product protection occurred here because the Kerns' frequent communications with Minnesota Department of Human Services ("DHS") staff about matters related to this litigation substantially increased the risk of disclosure of the protected communications to Defendants.[12] (Dkt. 84 at 13.) However, the flaw with Defendants' argument is that the emails at issue neither included nor were forwarded to DHS staff. The simple fact that the Kerns communicated with Mr. Schellack and DHS staff about the same subject matter cannot be sufficient to waive work product protection.

---

[12] For all relevant purposes, DHS operates the MSH and are responsible for Plaintiff's treatment. (*See* Dkt. 48 ¶¶ 1, 3.) In referring to DHS and its staff, Defendants do not attempt to distinguish them from the MSH staff referred to in the Complaint nor identify non-MSH DHS staff that the Kerns communicated with. Court thus assumes DHS staff means MSH staff for present purposes. Regardless, the distinction makes no difference in the analysis here.

In any event, the instant case is distinguishable from cases where courts determined that there was a substantial risk of disclosure. *See Monarch Fire*, 2009 WL 2155158, at *2 (concluding that attorney's disclosure of materials to law enforcement for potential prosecution constituted waiver because it substantially increased the likelihood that opponents would obtain the documents); *Buergofol GmbH v. Omega Liner Co.*, No. 4:22-CV-4112-KES, 2025 WL 1744938, at *7 (D.S.D. June 24, 2025) (finding waiver because company's disclosure of protected materials to former employee who was known to be "involved in multiple lawsuits" against the disclosing party "substantially increased the likelihood" that the adverse party would obtain those materials); *McKenzie L. Firm, P.A. v. Ruby Receptionists, Inc.*, 333 F.R.D. 638, 648 (D. Or. 2019) (same where attorney's disclosure was to a third party that the attorney knew to have a contentious relationship with the attorney's client). The Kerns' communications with DHS, without more, did not substantially increase the risk of disclosure to adversaries, let alone one that would constitute grounds for waiver.

The only case Defendants cite, *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, No. 15-md-2666, 2017 WL 5188342 (D. Minn. Mar. 7, 2017), is inapposite. There, the court found that an attorney waived work-product protection by "mass-emailing" documents to "a professional group's membership list" because doing so came with "the risk that one of those unknown recipients could share the documents with their adversary." *Id.* at *5. In fact, the attorney acknowledged in a separate email, "We must assume that [the other party] is going to get hold of this." *Id.* Here, there have been no

allegations that the Kerns sent or attempted to send these emails to any known or unknown third parties. The Kerns' communications with DHS did not carry the same risk that a blind mass dissemination does.

For these reasons, the Court concludes that Plaintiff's attorney did not waive work-product protection over his emails with the Kerns.

## IV.    ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED that:**

1. Defendant's Objections to Judge Elkins's Order (Dkt. 84) are **OVERRULED**;

2. Judge Elkins's Order denying Defendant's Motion to Compel (Dkt. 82) is **AFFIRMED**; and

3. Defendants' Motion to Compel (Dkt. 65) is **DENIED**.


Date: October 24, 2025                        *s/ Katherine M. Menendez*
                                              Katherine M. Menendez
                                              United States District Judge