**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Cody Raymond Kern,

Plaintiff,

v.

Direct Care and Treatment Executive Board[1] and State of Minnesota,

Defendants.

No. 24-cv-348 (KMM/SGE)

**ORDER**
***FILED UNDER SEAL***

---

This matter is before the Court on Defendants Direct Care and Treatment Executive Board ("the Board") and State of Minnesota's ("the State") Motion for Summary Judgment. (Dkt. 91.) For the following reasons, the Motion is granted.

## I. BACKGROUND[2]

### A. The Forensic Mental Health Program

In 2019, a Minnesota state court determined that Plaintiff Cody Kern was mentally ill and dangerous and civilly committed him to Defendants' custody and care.[3] (*See, e.g.*,

---

[1] The parties jointly moved on April 9, 2026 to substitute the Direct Care and Treatment Executive Board for Shireen Gandhi as a Defendant to this action (Dkt. 110), which the Court granted that same day (Dkt. 112).

[2] Unless otherwise stated, the facts recited in this section are undisputed.

[3] Mr. Kern was specifically committed to the Commissioner of the Minnesota Department of Human Services. (Dkt. 95-1 at 4.) In 2025, that authority was transferred to the Board. *See* Minn. Stat. § 246C.02 (2023) (establishing the Board); Minn. Stat. § 246C.04 (2023) (outlining transfer of duties).

Dkt. 95-1 at 2–5, 7–15 (commitment orders).[4]) Since then, Mr. Kern has been a patient of the Forensic Mental Health Program ("FMHP") within the Minnesota Security Hospital ("MSH") in Saint Peter, Minnesota. (*E.g.*, Dkt. 95-1 at 21.) FMHP serves people who have been civilly committed because they were deemed mentally ill and dangerous. (Dkt. 93 at 4; Dkt. 100 at 3; *see* Dkt. 95-1 at 66 (26:17–19); Dkt. 95-1 at 99 (99:21–25).[5]) FMHP is governed by the Board, which operates the State's mental health facilities. Minn. Stat. § 246C.02, subd. 3 (2023); (*see* Dkt. 95-1 at 35 (8:9–20)).

An FMHP patient's treatment needs are determined via an Individualized Treatment Plan ("ITP"), which the patient receives upon entering FMHP. (Dkt. 95-1 at 66 (26:20–27:13); *see* Dkt. 95-1 at 166–70 (Treatment Planning policy).) A patient's initial ITP is formulated based on various assessments undertaken in their first 24 hours in the program, including a doctor's assessment, a nursing assessment, a history and physical assessment, a social work assessment, a dietary assessment, an occupational therapy assessment, and a vocational assessment. (Dkt. 95-1 at 66 (27:2–7); *id.* at 131 (27:4–28:7); *id.* at 152 (33:24–34:8).) It also includes psychiatric and psychological assessments, all which are used to determine areas of needed treatment. (Dkt. 95-1 at 42 (37:7–22): *id.* at 152 (34:1–3).) "The purpose of the assessments is to determine all the needs the individual might have, whether it's medical, psychiatric, behavioral, patient needs, chemical dependency. So it's

[4] Citations are to the ECF pagination unless stated otherwise.

[5] The format of citations to transcripts is as follows: ECF pagination (transcript pagination:line number).

determining all the needs that a patient has and the course of action to move forward for the individual." (Dkt. 95-1 at 152 (35:3–11) (deposition testimony of Carol Olson, former MSH administrator).) FMHP also uses the Short-Term Assessment of Risk and Treatability ("START") guide—"a clinical guide for the dynamic assessment of short-term risk for violence and treatability used to inform clinical interventions and assist in treatment and risk management plans"—in formulating proper treatment. (Dkt. 95-1 at 167.) The ITP is updated every month for the first three months, before being reviewed quarterly or as necessary. (Dkt. 95-1 at 66 (27:21–28:3); *see* Dkt. 95-1 at 169.)

A patient's treatment team is comprised mostly of medical professionals, with participatory roles including nurses, occupational therapists, nurse practitioners, psychologists, recreational therapists, behavioral analysts, and forensic support specialists. (Dkt. 95-2 at 6 (15:2–16:16); Dkt. 95-1 at 206 (17:16–18:11); *see* Dkt. 95-1 at 41–42 (33:13–34:11) (stating that "generally" a treatment team includes a forensic support specialist, a nurse, a unit psychologist and/or social worker, a mental health practitioner tasked with "coordinating and integrating the overall treatment plan," and "a number of other therapists and professionals," such as an occupational therapist and recreational therapist).) Members of FMHP's operational team, such as clinic directors, unit supervisors, social workers, and nursing supervisors, are also part of the treatment team. (Dkt. 95-2 at 6 (15:2–16:10); Dkt. 95-1 at 206 (17:16–18:11).)

The treatment team determines each patient's "liberty level" within FMHP. (*See* Dkt. 95-1 at 138 (53:17–21); *id.* at 137 (50:18–24); *see also id.* at 181 (discussing liberty-level determinations); *id.* at 169 (noting that the treatment team is responsible for reviewing

"the patient's liberty level and level of care" on an ongoing basis); *see generally* Dkt. 95-1 at 180–83 [hereinafter "Liberty Level Policy"].) Each liberty level provides patients with a different amount of individual latitude, including the ability to engage in various activities with or without staff and the permission to travel within the facility and beyond. (*See* Liberty Level Policy at 1 (defining "Liberties" as "interventions that allow for gradual and integrated programming, which provides a therapeutic purpose consistent with the [ITP]" and include "a variety of building-wide, campus and community-based programming opportunities that may be staff supported or independent"); *see id.* at 1–2 (describing each liberty level).)[6] The liberty-level system is organized by color, with the spectrum of most restrictive to least restrictive as follows: gray, orange, yellow, blue, and green. (*See* Liberty Level Policy at 1–2.) A patient's liberty level is considered as part of their ITP. (*See* Dkt. 95-1 at 169.)

The treatment team assigns liberty levels "based on [the patient's] progress in treatment, identified risks and legal status." (Liberty Level Policy at 1.) Determinations are made by applying both clinical and legal indicators as well as considering the level of support necessary for each patient. (Liberty Level Policy at 2; Dkt. 95-1 at 48 (58:4–8) ("We do have a liberty level policy that speaks to general requirements for those liberty levels. So there are some objective guideposts for those liberty levels. And then there is also some subjective assessments . . . ."); *id.* (noting the use of the START guide to determine proper liberty levels).) However, there is no list of specific requirements for

---

[6] Cites to the Liberty Level Policy are to the pagination in the upper right-hand corner of the document.

attaining each level, and liberty-level determinations are instead made on an individualized basis. (*See* Dkt. 95-1 at 197 (46:17–47:8); *see* Liberty Level Policy at 2 (noting that due to such an individualized approach, "some [patients] may move through each level (i.e., color) in order, [while] others may not"); Dkt. 100 at 4 ("The [liberty level] policy 'contains general requirements and guideposts for each liberty level,' but the policy instructs that 'the decision to advance a patient to a higher level is based upon the individual patient's treatment needs and progress.'" (citing Dkt. 94 at 6)).) Variances—or "deviations from [the standardized] guidelines"—are sometimes made depending on the patient. (Liberty Level Policy at 3.)

Patients can request changes to their liberty-level designations. (Liberty Level Policy at 2.) Patient-initiated requests are first sent to the treatment team for a determination, with approvals then referred to the clinical/program director/designee for final consideration. (Liberty Level Policy at 2.) A patient's liberty level can improve based on clinical readiness and safety. (Dkt. 95-1 at 154 (43:21–44:3).) A patient can be demoted if they show a decline in status/psychiatric decompensation, violate the rules, or for safety reasons. (Dkt. 95-1 at 154 (44:17–25); *id.* at 207–08 (24:12–25).) Fundamentally, however, liberty levels reflect a patient's treatment progress. (*See* Dkt. 95-3 at 124 (FMHP Patient Handbook) ("Liberties are increased as you move forward in treatment and are tied to your Treatment Plan.").)

FMHP is also broken up into multiple living units, each offering a different environment based on the treatment needs of the individual patient. (*See* Dkt. 95-1 at 172–

78 (Unit Transfers and Room Changes policy); *id.* at 36–37 (12:1–14:6) (discussing differences between the units).)

Mr. Kern is diagnosed with schizoaffective disorder, bipolar type and autism spectrum disorder (mild) ("ASD").[7] (*See* Dkt. 96-1.) The parties agree that the treatment team was aware of Mr. Kern's ASD but, as discussed below, dispute whether the treatment team properly considered his ASD in making the contested liberty-level determinations.

**B. Mr. Kern's Liberty Levels**

In this litigation, Mr. Kern takes issue with two liberty-level demotions he suffered in 2022, one in October and one in November. Prior to the events at issue, Mr. Kern resided in the Ironwood Unit and was designated at the yellow liberty level. (*See, e.g.*, Dkt. 95-1 at 20.) On October 21, 2022,[8] Mr. Kern's liberty level was reduced from yellow to orange. (Dkt. 96-2 at 15.) The parties sharply disagree on what events caused this demotion. Mr. Kern focuses on an incident where he commented that a female staff member appeared

[7] Although Defendants do not expressly concede that Mr. Kern is properly diagnosed with ASD (*see* Dkt. 93 at 1), counsel for Defendants confirmed at the April 2, 2026 hearing that, for purposes of this Motion, they were not contesting this diagnosis.

[8] Mr. Kern expresses ambiguity on when exactly this demotion occurred. (Dkt. 100 at 5 (stating that the reduction "occurred between October 21, 2022, and October 26, 2022").) FMHP records provided by Defendants indicate that the liberty level reduction occurred on October 21. (Dkt. 96-2 at 15.) However, the specific date is not material to the legal issues.

"lean."[9] (Dkt. 100 at 5–6; Dkt. 96-3 at 22.) Mr. Kern, in his deposition testimony, described the conversation as "friendly" and that the comment was "small talk." (Dkt. 95-1 at 120 (181:11–23).) Defendants do not necessarily dispute that characterization but instead point to six different instances of [redacted] that occurred between June and October 2022,[10] causing the liberty-level reduction. (Dkt. 93 at 10–11.) Mr. Kern does not dispute that he engaged in the specific behaviors described in these counterexamples but instead argues that each were caused by his ASD.

When Mr. Kern sought a liberty-level promotion on October 26, members of his treatment team denied the request, explaining that he had recently been demoted from yellow to orange. (Dkt. 96-3 at 17.) The treatment team explained that the demotion was caused by [redacted] despite warnings and a previous demotion due this behavior. (*Id.*) The reasoning also cited [redacted] (*Id.*)

[9] The parties appear to disagree on when this incident occurred, with Mr. Kern alleging that it occurred on or about October 21, 2022 (Dkt. 100 at 5–6), while Defendants allege it occurred on September 15, 2022 (Dkt. 93 at 10). The only relevant documentation in the record suggests it occurred on September 15. (Dkt. 96-3 at 22.) But to the extent Mr. Kern disputes this timeline, it is again immaterial.

[10] Each of these incidents involved Mr. Kern engaging or attempting to engage with female staff.

Mr. Kern's second liberty-level demotion—from orange to grey—came on November 22, 2022. (*See* Dkt. 96-3 at 3.) The parties again dispute the cause. Mr. Kern focuses on a single preceding incident in which he stared at a female staff member as the cause of the demotion.[11] (Dkt. 100 at 8.) Defendants cite four additional incidents following his first demotion as the reason for the second demotion, [redacted] Mr. Kern does not address these counterexamples in his brief or dispute that he engaged in such conduct. Treatment notes from November 22 state that Mr. Kern's demotion from orange to gray was [redacted] (Dkt. 96-3 at 3.) The notes also highlight that [redacted] (*Id.*)

Mr. Kern remained at a grey liberty level throughout most of 2023. (*See* Dkt. 96-3 at 2 (treatment notes from December 21, 2022); Dkt. 28 ¶ 66 (Defendants' Answer)

[11] Mr. Kern stated at his deposition that this incident happened between a day and a week before his second demotion. (Dkt. 95-1 at 119 (180:18–21); *see* Dkt. 100 at 8–9.) But Defendants' treatment records specifically discuss this incident on October 20, 2022. (Dkt. 96-2 at 15; Dkt. 96-3 at 20.) Again, to the extent this date is disputed, it is immaterial to the relevant legal issues.

(admitting Mr. Kern was placed at an orange liberty level on October 31, 2023).) In March of 2023, Mr. Kern was moved to the Fraser Unit, where he remained through the initiation of the lawsuit. (Dkt. 96-2 at 19; *see* Dkt. 95-1 at 80 (23:25–24:9).)

Mr. Kern alleges that the above facts illustrate how Defendants failed to accommodate his ASD because he was punished for behaviors exhibited due to his disability. (Dkt. 100 at 4–5.)

## C. Procedural History

Mr. Kern initiated this action on February 6, 2024 contending that these demotions constituted disability discrimination and retaliation. Specifically, Mr. Kern contends that the demotions were the result of behaviors caused by his ASD and, because FMHP has not accommodated his ASD, he has been subject to disability discrimination. He now advances two claims: (1) an Americans with Disabilities Act ("ADA") claim against both Defendants; and (2) a Rehabilitation Act ("RA") claim against the Board.[12] (Dkt. 48 ¶¶ 86–97.) Mr. Kern seeks declaratory and injunctive relief, setting forth a list of proposed reforms to bring Defendants into compliance.[13] (*Id.* ¶¶ 110–15.) He also seeks the appointment of an independent monitor, as well as damages and fees. (*Id.* ¶¶ 116–20.)

[12] The Amended Complaint also asserted claims for ADA and RA retaliation, but the Court dismissed those claims in June 2025. (Dkt. 78.)

[13] In part, the Amended Complaint sought injunctive relief to advance Mr. Kern's liberty level to blue. (Dkt. 48 ¶ 114(d).) Mr. Kern's counsel filed a letter on April 10, 2026 stating that Mr. Kern had now been returned to the blue liberty level. (Dkt. 113.) Therefore, to the extent this relief is sought, the Amended Complaint is denied as moot. *See United States v. Northshore Min. Co.*, 576 F.3d 840, 845–46 (8th Cir. 2009) ("If the thing sought to be enjoined in fact takes place, is no longer taking place, or can no longer take place, the grant or denial of an injunction becomes moot." (quoting 43A C.J.S. Injunctions § 90)).

On January 15, 2026, Defendants moved for summary judgment. (Dkt. 91.) Mr. Kern responded to the Motion on February 5, 2026 (Dkt. 100), and Defendants replied on February 19, 2026 (Dkt. 106). The Court held a hearing on the Motion on April 2, 2026. (Dkt. 114 (minute entry).)

## II. LEGAL STANDARDS

***Summary Judgment***

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Cearley v. Bobst Gr. N. Am. Inc.*, 129 F.4th 1066, 1069 (8th Cir. 2025). The moving party must demonstrate that the material facts are undisputed. *Celotex*, 477 U.S. at 322. A fact is "material" only if its resolution could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Lankford v. City of Plumerville*, 42 F.4th 918, 921 (8th Cir. 2022). When the moving party properly supports a motion for summary judgment, the party opposing summary judgment may not rest on mere allegations or denials, but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256; *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021). A dispute of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Courts must view the inferences to be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus.*

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Becker v. City of Hillsboro*, 125 F.4th 844, 851 (8th Cir. 2025).

***ADA and RA Standards***

Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Because the two statutes are largely indistinguishable, courts treat the ADA and RA interchangeably in many respects. *See Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998) ("The rights, procedures, and enforcement remedies under Title II [of the ADA] are the same as under section 504 [of the RA]."); *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998) ("The ADA has no federal funding requirement, but it is otherwise similar in substance to the Rehabilitation Act, and cases interpreting either are applicable and interchangeable.") (quotation omitted).

To establish disability discrimination, Mr. Kern must show "(1) that he is a qualified individual with a disability;[14] (2) that he was excluded from participation in or denied the benefits of the [public entity's] services, programs, or activities, or was otherwise subjected

---

[14] For purposes of their summary judgment motion, Defendants do not dispute that Kern is a "qualified individual." (Dkt. 93 at 23 n.10.)

to discrimination by the [public entity]; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010). Discrimination includes "failure to provide reasonable accommodations to a qualified individual's known disability." *Withers v. Johnson*, 763 F.3d 998, 1003 (8th Cir. 2014). "[A] public entity must make reasonable accommodations where necessary to give 'meaningful access' to programs or benefits; mere 'limited participation' by persons with disabilities is not equivalent to 'meaningful access.'" *Hall v. Higgins*, 77 F.4th 1171, 1181 (8th Cir. 2023) (quoting *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999)).

## III. DISCUSSION

Defendants move for summary judgment on Mr. Kern's ADA and RA claims. Before reaching the merits of Mr. Kern's claims, Defendants raise a threshold argument that his allegations are not cognizable as claims for disability discrimination. It is well established that disagreements with medical treatment decisions cannot be brought under either the ADA or the RA. *A.H. v. St. Louis County*, 891 F.3d 721, 729 (8th Cir. 2018) ("Improper medical treatment claims may not be brought under the ADA or RA."); *Shelton v. Ark. Dep't of Hum. Servs.*, 677 F.3d 837, 843 (8th Cir. 2012); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) (per curiam). However, in the custodial context, claims regarding the trappings of detention, such as the denial of meals, adequate housing, or other programming, are cognizable as ADA or RA claims. *See Dinkins v. Corr. Med. Servs.*, 743 F.3d 633, 634–35 (8th Cir. 2014) (citing cases).

Defendants argue that Mr. Kern's claims fail because liberty levels are a form of the medical treatment provided by FMHP. (Dkt. 93 at 28; Dkt. 106 at 9–10.) They stress that liberty levels are determined by a patient's medical providers based off that patient's clinical need, so Mr. Kern's dispute over that decision-making process is one regarding his medical treatment. (Dkt. 93 at 28.) Mr. Kern argues that liberty-level determinations are not medical treatment because they are not made for a medical purpose or diagnosis.[15] Instead, while highlighting that no precise line can be seen between medical treatment and non-medical treatment in the relevant caselaw, Mr. Kern argues that liberty levels are more akin to the cognizable, non-medical treatment examples listed in *Dinkins*. Mr. Kern is correct that the definition of "medical treatment" for these purposes is unclear. However, considering the undisputed facts in the record, the caselaw best supports the conclusion that Mr. Kern's disagreements with his liberty-level determinations are not cognizable as ADA or RA claims.[16] Specifically, the Court concludes that the liberty-level determination is, at bottom, medical in nature because it is inexorably intertwined with a patient's treatment plan and therapeutic progress.

Though sparse, the Eighth Circuit's relevant caselaw supports this conclusion. The Eighth Circuit has analyzed the scope of the medical treatment exception to the ADA and

---

[15] Though he did not respond to this argument in the briefing, Mr. Kern addressed this argument at the hearing on the motion.

[16] While the Court rejected this argument at the motion to dismiss stage, it noted at the July 23, 2024 hearing on the First Motion to Dismiss that that conclusion was based on the factual allegations, taken as true, in the Complaint and that the issue would be better explored at the summary judgment stage. (*See* Dkt. 78 at 14.) The Court now has before it a complete record, including substantial information about liberty-level determinations.

RA on three occasions: *Dinkins v. Correctional Medical Services*, 743 F.3d at 633; *Shelton v. Arkansas Department of Human Services*, 677 F.3d at 843; and *A.H. v. St. Louis County*, 891 F.3d at 730. Of the three, *Dinkins* best defines the two sides of this issue. There, the plaintiff, a prisoner diagnosed with pernicious anemia, challenged a variety of conduct by the prison and its officials, including their failure to properly diagnose and treat his disorder, resulting in his partial paralysis; the officials' decision to deny him assignment to a care unit and instead place him in administrative segregation; and their failure to provide disability accommodations despite his requests, resulting in the denial of services. 743 F.3d at 634. In describing what was and was not cognizable under the ADA and RA, the court wrote:

> This court also affirms the dismissal of the claims . . . based on medical treatment decisions—including not properly diagnosing and treating Dinkins's pernicious anemia—which cannot form the basis of a claim under the RA or the ADA. . . .
>
> Some of Dinkins's claims, however, do not appear to be based on medical treatment decisions. His alleged denials of meals and adequate housing by reason of his disability can form the basis for viable ADA and RA claims.

*Id.* In doing so, the court cleanly categorized the failure to properly treat a medical disorder as noncognizable and the denial of certain services as cognizable. Unfortunately, it did not specifically address the cognizability of a claim challenging the defendants' decision to deny the plaintiff assignment to a care unit—the most analogous allegation to those alleged by Mr. Kern.

On remand to the Western District of Missouri, however, the district court filled that gap, concluding that the defendants' assignment decision was medical treatment and thus

not cognizable. *Dinkins v. Corr. Med. Servs.*, No. 2:09-cv-04111-NKL, 2015 WL 2062563, at *6 (W.D. Mo. May 4, 2015). The court reasoned that a prisoner's placement in the care unit required a doctor's order and that the assignment determination "relied on the independent medical determinations of licensed medical providers when assessing appropriate medical care." *Id.*

The Eighth Circuit's other two opinions provide additional guidance. In *Shelton*, the court concluded that a decision to take an inmate off suicide watch days before her death by hanging was a medical treatment decision. 677 F.3d at 843. The court provided two primary reasons for this conclusion: first, the decision was made by a medical doctor under whose care the plaintiff was admitted to the facility; and two, there was "no allegation that the removal from suicide watch was influenced by anything other than a physician's judgment." *Id.* Similarly, in its most recent decision on the issue, *A.H. v. St. Louis County*, the court held that a prison's failure to prevent an inmate's suicide was also noncognizable as either an ADA or RA claim. 891 F.3d at 730. There, the plaintiff was discharged from a higher security unit to general population—where he later committed suicide—after interfacing with multiple medical professionals, including mental health professionals, who reported no suicidal ideation despite a prior suicide attempt and an earlier incident of self-harm. *Id.* at 724–25. Despite allegations that the inmate had been discriminated against "based on social, educational, recreational, religious and safety accommodations, not medical treatment decisions" and that he was not given "appropriate medication, protection from hazards, and security monitoring that would have prevented him from committing suicide," the court dismissed the claims, reasoning that the allegations were "in essence"

claims for inadequate medical treatment like those in *Shelton*. *Id.* at 730 (quotations omitted).

Together, these decisions demonstrate that disputes with a medical professional's decision-making or provision of services, even if it has administrative components, is noncognizable under either the ADA or the RA. This approach is echoed by other circuit courts. *See Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (concluding that "the [ADA] would not be violated by a prison[] simply failing to attend to the medical needs of its disabled prisoners" because it "would be extremely odd to suppose that disabled persons whose disability is treated negligently have a federal malpractice claim by virtue of the [ADA]"); *Doe v. Pfrommer*, 148 F.3d 73, 84 (2d Cir. 1998) (holding that the plaintiff failed to establish claims for disability discrimination where he challenged the "substance of the services" provided by the state vocational educational services program rather than some discriminatory act); *see also Tardif v. City of New York*, 991 F.3d 394, 407 (2d Cir. 2021) (disagreeing that the ADA provides "a more general avenue to sue . . . any time there is an allegation by an inmate of a denial of medical services without the support of a medical judgment by the prison") (quotation omitted).

The Court sees two reasons why Mr. Kern's complaints are noncognizable under the ADA or RA. First, the record shows that the liberty-level decision-making process taken by the treatment team was medical in nature. The treatment team is comprised overwhelmingly of medical professionals who make liberty-level determinations in conjunction with a patient's ITP. The team's composition is analogous to the mix of both medical and mental-health professionals who treated the plaintiff in *A.H. v. St. Louis*

*County*. The determination by this group is tailored to Mr. Kern in direct consideration of his necessary level of support and related directly to his clinical success. FMHP policy itself describes "liberties" as "interventions that allow for gradual and integrated programming, which provides a therapeutic purpose consistent with the [ITP.]" (Liberty Level Policy at 1.) In this way, the liberty levels are a reflection of phases of and progress in Mr. Kern's medical treatment. (*See* Dkt. 95-3 at 124 ("Liberties are increased as you move forward in treatment and are tied to your Treatment Plan.").) Mr. Kern does not dispute these facts. (*See* Dkt. 100 at 3 ("The basic facts about the FMHP Treatment Program itself are undisputed."); *id.* ("The basic facts about the FMHP liberty level system and policy are undisputed.").)

Second, Mr. Kern's dispute is, "in essence," a dispute with those treatment decisions. *A.H.*, 891 F.3d at 730. Looking just at the allegations central to Mr. Kern's position, the occurrence of which are undisputed, this action is focused on certain behaviors exhibited by Mr. Kern toward FHMP staff, specifically how he looked at certain staff members and the nature of certain comments he made. Defendants, through Mr. Kern's treatment team, considered these behaviors to be relevant to his clinical treatment and downgraded Mr. Kern's liberty-level status accordingly. Mr. Kern now contests the significance of those actions and contends that the treatment team failed to adequately consider his ASD diagnosis. That makes this dispute squarely one with his medical treatment. Tellingly, when asked to clarify the precise accommodation Mr. Kern seeks, his counsel stated that the request was to have the treatment team "take into account his ASD in how they decide his liberty levels." (Apr. 2, 2026 Hearing.) But that supposed

accommodation is just a request for his treatment decisions to be made differently, regardless of its framing. *See DiFraia v. Ransom*, 171 F.4th 622, 633 (3d Cir. 2026) (denying ADA claim that "conflate[d] a method of treating a disability with an accommodation" because it "just repackage[d] his complaint that he was not given the treatment he desired"). The same is true of the alleged accommodation requests made by Mr. Kern and his family prior to this lawsuit. (Dkt. 100 at 18 (requesting that the treatment team better consider his ASD as part of the treatment plan).) Because the two liberty-level determinations specifically at issue in this lawsuit are both medical in nature and the dispute is over how those decisions are made, Eighth Circuit precedent precludes Mr. Kern's claims.

This is not to say that every decision made by an FHMP treatment team is omitted from the scope of the ADA or RA. *See, e.g.*, *Larson v. Minn. Dep't of Hums. Servs.*, No. 23-cv-1823 (JRT/DJF), 2024 WL 4485572, at *15 (D. Minn. May 16, 2024) (concluding that a prison's decision to place the plaintiff in solitary confinement due to his PTSD was not precluded by the ADA or RA), *R&R adopted*, 2024 WL 4345533 (D. Minn. Sept. 30, 2024). But here, the dispute is fundamentally one over medical treatment, which is not cognizable under the ADA or RA.

* * *

Applying Eighth Circuit precedent to the undisputed facts in this case, Mr. Kern's claims for relief are noncognizable under the ADA and RA. Therefore, the Court grants Defendants' Motion for Summary Judgment (Dkt. 91) and dismisses the remainder of this action.

## IV. ORDER

Accordingly, **IT IS HEREBY ORDERED THAT**:

1. Defendants' Motion for Summary Judgment (Dkt. 91) is **GRANTED**; and
2. Plaintiff Cody Kern's ADA and RA claims are **DISMISSED WITH PREJUDICE**.

**Let judgment be entered accordingly**.

Dated: August 11, 2026

*s/Katherine M. Menendez*_______
Katherine M. Menendez
United States District Judge